**VILLAGE OF TERRACE PARK et al. v. ERRETT.**

(Circuit Court of Appeals, Sixth Circuit. April 6, 1926.)

No. 4480.

1. **Municipal corporations** &⫰625—**Village may not exercise power to pass zoning ordinance in unreasonable manner.**

Village, though duly authorized to adopt zoning ordinance, cannot exercise that power in such arbitrary and unreasonable manner that ordinance will be unconstitutional in its operation and effect.

2. **Municipal corporations** &⫰63(2).

Courts will not interfere with municipality's exercise of police power, except for manifest arbitrary or unreasonable exercise thereof.

3. **Deeds** &⫰143.

Reservation in a deed does not create title or enlarge vested rights of grantor, but merely reserves specific interest.

4. **Constitutional law** &⫰296(2)—**Municipal corporations** &⫰625—**Zoning ordinance, as applied to gravel pit within residence district, held unreasonable and unconstitutional** (Act Ohio April 17, 1923 [110 Ohio Laws, p. 275]; Const. Ohio, art. 1, §§ 1, 19; Const. U. S. Amend. 14, § 1).

Zoning ordinance of village of Terrace Park, adopted under authority of Act Ohio April 17, 1923 (110 Ohio Laws, p. 275), in its application to property within residence district sought to be used as a gravel pit, *held* unreasonable, and violative of Const. Ohio, art. 1, §§ 1, 19, and Const. U. S. Amend. 14, § 1.

Appeal from the District Court of the United States for the Western Division of the Southern District of Ohio; Benson W. Hough, Judge.

Suit by Russell Errett against the Village of Terrace Park and others. Decree for plaintiff, and defendants appeal. Affirmed.

Russell Errett, a citizen of Florida, is the owner of block 23 in the village of Terrace Park, Ohio, which village is located about 13 miles from the business center of Cincinnati. Block 23 is a tract of 8.8 acres of unimproved farm lands, that has never been subdivided into town lots.

In June of 1923 the council of the village of Terrace Park, under favor of section 4366—1 to 12, inclusive, and the Act of April 17, 1923 (110 Ohio Laws, p. 275), established a village planning commission, which began its deliberations in July of 1923, and on November 5, 1923, certified to the village council a proposed zoning ordinance and map dividing the village into two districts, residential and business. The business district was established in and about the stores and shops in the northeastern portion of the village, and all the rest of the territory within the village limits was designated as a residential district. This ordinance was passed by the village council as emergency legislation on December 20, 1923.

On May 9, 1924, Errett, against whom an affidavit had been filed charging him with having offended against this ordinance, filed a bill in equity against the city and its mayor to enjoin its enforcement, in so far as it applies to block 23. It is alleged in the bill that the ordinance is wholly illegal and void, and in violation of sections 1 and 19 of

article 1 of the Constitution of Ohio, and of section 1 of the Fourteenth Amendment to the federal Constitution. Complainant further averred in substance that the ordinance is unreasonable and arbitrary, and unconstitutional in its operation and effect.

The village by answer denied these allegations of the bill, and further averred that the ordinance is not unreasonable or arbitrary, that the act of the Legislature authorizing the same is constitutional, and that the adoption of this ordinance was in conformity with the provisions of the Constitution and the laws of the state of Ohio, and not in violation of plaintiff's constitutional rights.

The trial court found on the issue joined for the plaintiff, and enjoined the village of Terrace Park and its officers from enforcing this ordinance against the plaintiff or his successor in title to this real estate, but confining the excavation of gravel to a grade rising in easy steps from the railroad right of way on the west and the public highway on the south, in such a way as not to impair the necessary support for Stanton avenue in its present grade, or any other street, if there be other streets to which the village may be entitled.

From this decree the village appealed. No cross-appeal was taken.

Carl Phares and John Weld Peck, both of Cincinnati, Ohio (Peck, Shaffer & Williams and Knight & Phares, all of Cincinnati, Ohio, on the brief), for appellants.

Robt. Black and C. C. Benedict, both of Cincinnati, Ohio (Jas. J. Muir, of Cincinnati, Ohio, on the brief), for appellee.

Alfred Bettman, of the Ohio State Conference on City Planning and United City Planning Committee of Cincinnati, amici curiæ.

Before DENISON and DONAHUE, Circuit Judges, and COCHRAN, District Judge.

DONAHUE, Circuit Judge (after stating the facts as above). In the disposition of this case it is wholly unnecessary to determine the constitutionality of the Ohio statutes conferring power upon a municipality to appoint a planning commission and pass zoning ordinances or the constitutional power of the village to pass such ordinance regardless of the authority conferred by statute.

[1] For the purpose of this case it may be conceded that the village, in the exercise of its police power, either delegated to it by statute or vested in it by the Constitution of Ohio, has authority to pass a zoning ordi-

12 F.(2d)—16

nance reasonably necessary for the preservation of public health, morals, or safety (Pritz v. Messer, 112 Ohio St. 628, 149 N. E. 30), where such necessity appears either from existing conditions or reasonable anticipation of future growth and development. But it does not follow that it can exercise that power in such an arbitrary and unreasonable manner that the ordinance will be unconstitutional in its operation and effect. Youngstown v. Kahn Bros. Building Co., 112 Ohio St. 654, 148 N. E. 842. In such event the owner of property whose constitutional rights are invaded thereby is entitled to the same relief that would be given him if the statute conferring the power were unconstitutional. Oklahoma Gas Co. v. Russell, 261 U. S. 290, 292, 43 S. Ct. 353, 67 L. Ed. 659.

[2] Courts, however, will not interfere with the exercise of the police power by a state or municipality, except for a manifest arbitrary and unreasonable exercise of that power. State ex rel. v. Rendigs, 98 Ohio St. 251, 259, 120 N. E. 836. In Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 43 S. Ct. 158, 67 L. Ed. 322, 28 A. L. R. 1321, it was held: "One consideration in deciding whether limitations on private property, to be implied in favor of the police power, are exceeded, is the degree in which the values incident to the property are diminished by the regulation in question, and this is to be determined from the facts of the particular case. * * * The general rule, at least, is that, if regulation goes too far it will be recognized as a taking for which compensation must be paid."

[3] It is claimed, however, that Coal Co. v. Mahon, supra, is distinguished from this case by the fact that the coal company reserved to itself the coal and right to remove the same when it sold the surface; that this amounted to a contract with the purchaser that it should have and retain the right to remove this coal. In answer to this, it is sufficient to say that a reservation in a deed does not create title or enlarge the vested rights of a grantor, but merely reserves the specific interest named therein from the operation of the grant. The owner of a fee-simple estate in land has the same vested interest and property rights in the minerals in or underlying the land as an owner who has executed a deed to the surface, reserving the minerals. In either case, the same rule applies in determining whether an ordinance is regulatory in its nature, or amounts to a taking of private property without compensation.

[4] There is no serious conflict in the evidence tending to prove the degree in which the values incident to block 23 would be diminished by the enforcement of this ordinance. It is admitted in the answer that plaintiff began operations in June, 1923, along the railroad and on railroad property, for installing a plant for the removal of gravel from this property. Evidence was offered on the part of the plaintiff tending to prove that these operations began early in 1923, and that plaintiff actually commenced the erection of a building in September of that year, and that before he had any knowledge or notice of the passage of this ordinance he purchased machinery and completed the plant at a total cost of more than $51,000. It is claimed on the part of the plaintiff that the profits arising from the operation of this plant would not only amortize its cost, but yield a substantial revenue upon the investment, and that the passage of this ordinance as an emergency legislation was clearly for the purpose of anticipating the completion of this plant, for the reason that none of the other more than 60 different uses prohibited in the business district were so imminent or threatening as to create an emergency.

It is admitted by the village that this gravel is worth on a royalty basis 10 cents per cubic yard. Evidence was offered by the plaintiff tending to prove it was worth 10 to 15 cents per cubic yard, and that approximately 470,000 to 500,000 cubic yards may be removed therefrom without destroying its value for residence purposes, but, on the contrary, enhancing that value. If this gravel plant is worth what it cost, if used for the purposes intended, then the present value of block 23, including the plant, would be at least $100,000 over and above its value for residence purposes, which does not, in its present condition, exceed $5,000. Notwithstanding the claims of plaintiff as to the cost of this plant and its probable earning power, the question of its value and profits that would be derived from its operation are largely speculative; nevertheless it unquestionably has some value that should be taken into consideration.

For the purpose of this case, however, it is unnecessary to consider the value of this plant, or the possibility of profits that may be derived from its operation. It clearly appears from the evidence that the value of this gravel that may be removed in leveling this block with advantage to its desirability and value for residence purposes, reckoned on a royalty basis alone, is approximately $50,-000, which value would be wholly lost to the plaintiff by the operation and effect of this ordinance. This loss bears no reasonable proportion to remaining values, but on the contrary is 10 times the value of the land for the uses permitted by the ordinance, which use will be available to plaintiff after the gravel is removed, which, as appears from the evidence, may be accomplished in three to five years with the facilities now in place. These facts, concerning which there is little or no conflict in the evidence, in and of themselves, demand a careful scrutiny by a court of equity of the urgency of the public need, that requires such drastic exercise of the police power for the protection of public health, safety, convenience, comfort, prosperity, and general welfare.

Terrace Park is not without a history that must be considered in connection with conditions that now obtain, in order to determine the urgency of the public need and the reasonableness of this zoning ordinance to meet that need. Long prior to 1873, part or all of the territory east of Elm street was platted, and some houses built thereon. In 1873 all of the territory lying west of Elm street was unimproved farm lands. In that year T. R. Biggs, who was then the owner of this land, filed a plat of the subdivision of Gravellotte, but block 23 and block 32 were not included within this subdivision. In 1893 Terrace Park was organized as a village, and, with a still larger vision of its future needs, blocks 23, 32, and some additional unimproved farm lands were included within its territorial limits of 435 acres. Upon this entire acreage there has been erected but 100 houses, practically all of which are located east of Elm street, and extending from Elm street to the eastern and northern limits. In that portion of the village the streets have been opened and kept in repair, and shade trees planted; but there are still as many, or more, vacant lots in this territory east of Elm street available for residence purposes than lots upon which buildings have been erected.

Except for two houses, built upon tracts of about 4 acres each, north of Stanton avenue, the 75 acres lying west of Elm and east of the railroad tracks are wholly undeveloped, and none of the streets shown on the plat, except Stanton avenue, have been opened for travel. Block 23 is triangular in shape, and located in the extreme southwestern corner of this 75 acres, and is bounded on the west by the railroad right of way, on the south by the public highway, and on the east by undeveloped farm lands extend-

ing to Elm street. On the north it has a short frontage on Stanton avenue.

While available, it is not desirable for residence purposes, because of the noise and smoke from trains that pass every 30 minutes over the railroad tracks adjacent to it on the west, and an abandoned gravel pit, in near proximity thereto, which is now being used by the village as a dump for refuse. There are also high bluffs on the west adjoining the railroad and on the south adjoining the public highway. There is no access to block 23, except from the short frontage on Stanton avenue. The removal of this gravel will not only grade the lot from Stanton avenue to the public highway, but will furnish further and better means of access. West of the railroad and directly opposite block 23 is a tract of land, between the railroad and Wooster pike, that was formerly occupied as winter quarters for the Robinson circus. This use has been abandoned, but there is still an old house and some old outbuildings standing thereon. There are but three houses within a radius of 1,500 feet from the center of block 23, and 27 houses, including one schoolhouse, within a half-mile distance therefrom.

It further appears that the business contemplated by Errett on block 23 is not of a permanent nature, but, on the contrary, so temporary in character that the ordinance prohibiting it cannot be justified upon the theory that there is a present need to prevent the establishment of a permanent business in a territory that, in the march of progress, will shortly be needed for residential purposes. The march of progress in Terrace Park has not been so rapid as to induce a reasonable belief that Gravellotte subdivision, in which only two houses have been built in the more than 50 years since it was platted, will become desirable, much less necessary, for residential purposes in the short time that will be required to remove this gravel.

There is also a substantial difference between an ordinance prohibiting manufacturing or commercial business in a residential district that may be conducted in another locality with equal profit and advantage; and an ordinance that wholly deprives the owner of land of its valuable mineral content. This difference was recognized by the Supreme Court in Hadacheck v. Los Angeles, 239 U. S. 394, 36 S. Ct. 143, 60 L. Ed. 348, Ann. Cas. 1917B, 927, in which case it was held that, "while an ordinance prohibiting the manufacturing of bricks within a specified section of a municipality may be a constitutional exercise of the police power, quære whether prohibiting of digging the clay and moving it from that section would not amount to an unconstitutional deprivation of property without due process of law." In this connection the court cited with approval Ex parte Kelso, 147 Cal. 609, 82 P. 241, 2 L. R. A. (N. S.) 796, 109 Am. St. Rep. 178, wherein the court declared invalid an ordinance absolutely prohibiting the maintenance or operation of a rock or stone quarry within a certain portion of the city of San Francisco, upon the theory that such ordinance absolutely deprived the owners of real property of a valuable right incident to their ownership, but further held that operation of such stone quarry could be regulated. The court also cited with approval Reinman v. Little Rock, 237 U. S. 171, 35 S. Ct. 511, 59 L. Ed. 900, in which case the operation of a livery stable was lawfully prohibited, because that particular business was not affixed to or dependent upon its locality, and could be conducted elsewhere.

Evidence was offered by the village tending to prove that the dust and noise from the operation of this plant would not only be disturbing and annoying to its citizens, but a menace to the public health. Upon these questions there is a conflict in the evidence, but there is no conflict in the evidence tending to prove the distance the plant is to be located from the residences and school in Terrace Park, or that this plant is to be operated by electricity and housed as far as possible, to prevent the escape of dust and subdue the noise of its operation. Upon a full consideration of all of this evidence we have reached the conclusion that the health of the citizens of Terrace Park will not be imperiled by the operation of this plant at such a remote distance from their homes, and that the possibilities of discomfort and annoyance are more imaginary than real, and in no wise to be compared with the inconvenience or annoyance of the noise and soot of the trains that pass through this village every 30 minutes.

For the reasons stated, this ordinance, if enforced in the terms in which it is written, or to any extent beyond the limitations imposed by the decree of the District Court, would be arbitrary, unreasonable, and unconstitutional in its operation and effect, and not merely regulatory in character, but a taking of private property without compensation.

Affirmed.