[Crim. No. 2313.   First Dist., Div. Two.   Aug. 8, 1944.]

In re LOUIS ANGELUS, on Habeas Corpus.

J. Paul St. Sure, Edward H. Moore and James R. Agee for Petitioner.

F. Bert Fernhoff, City Attorney (Oakland), Archer Bowden, Deputy City Attorney, and Ralph E. Hoyt, District Attorney (Alameda), for Respondent.

STURTEVANT, J.—This is an application for a writ of habeas corpus brought for the purpose of determining the validity of sections 2-6.01 and 7-1.08 of the Municipal Code of the City of Oakland. Further facts will be stated as we proceed.

The charter under which it is now acting was adopted by the city of Oakland July 1, 1911. Zoning ordinances were authorized by the act of 1917, page 1419. On February 5, 1935 a zoning ordinance thereafter codified in the Municipal Code was adopted. Section 2-6.01 is as follows:

"Excavations other than in streets. It shall be unlawful for any person to make, or cause or permit to be made, any excavation in or under the surface of any land, public or private, in the City of Oakland, without first obtaining a permit so to do from the City Manager in the manner hereinafter provided, excepting, however, excavations provided for in Article 2 of Chapter 6 of this Code, and excavations for foundation or basement for the erection of a building on the premises in which the excavation is to be made and for which a building permit has been issued. Any excavation referred to herein shall include the removal of any soil, rock, sand, or other material for purposes of sale, fill, building, or other construction usage off the premises from which removed."

Section 7-1.08 is as follows:

" 'A' District Uses. In the 'A' One-Family District the following regulations shall apply, and the following uses only are permitted:

"One family dwellings,

"Museums, libraries, parks, playgrounds or community centers owned and operated by the City of Oakland.

"Golf Courses.

"Farms and truck gardens.

"Churches.

"Public and parochial elementary and high schools.

"Cemeteries, mausoleums, columbariums and crematories existing on January 1, 1935; alterations or additions thereto; uses requisite to, necessary for, related to, or incidental thereto.

"Accessory buildings on the same lot with any of the above uses, including one private garage, or one private stable for the keeping of not to exceed three (3) horses, when located not less than sixty (60) feet from the front lot line nor less than five (5) feet from any other street line, or a private garage constructed as a part of the main building.

"No outdoor advertising or display or sign of any character shall be permitted in the 'A' District, except: a name plate not exceeding one (1) square foot in area, a sign not exceeding six (6) square feet in area appertaining only to the lease, hire, sale or display of a building or premises; provided further, that no sign or name plate shall be permitted in a front yard or its projection across the entire width of the lot."

Within the extreme southeast corner of the boundary lines of the city of Oakland is a tract called Sheffield Village. It comprises about 100 acres. As shown by photographs introduced in evidence the village is small and stands at the foot of some hills which nearly surround it and gently roll back from the village. Like all rolling hills they do not have any uniform slope. On some the slope is very gradual, say one foot in four. In other places the slope seems to be nearly one foot in one. The photographs do not indicate any out-croppings of rock. On the 20th day of July, 1942, the petitioner entered into a conditional contract of purchase under the terms of which E. B. Field Corporation, as owner, contracted to sell a tract of about 29 acres to petitioner for the price of $11,000. The first installment was fixed at $1,100 and was payable on the delivery of said contract and the balance was payable in installments of $250 every three months until the purchase price was fully paid. The boundaries of the tract so agreed to be sold are not contained in the contract. It recites that the boundaries are contained in Exhibit "A," however no copy of Exhibit "A" is contained in the record.

Prior to June 22, 1944, the petitioner entered upon the tract which he had agreed to purchase, proceeded to dig and

excavate a truck load of soil, hauled it off the tract and sold and dumped the truck load. Later he was arrested and thereafter applied for a writ of habeas corpus. Had he not been arrested it was his plan and intention to remove 900,000 yards of the surface soil from his property and haul it away and sell it. The cut which the petitioner proposed to make is not clearly shown by the record before us. There are a number of gullies or small creek beds leading down the side of the hill toward Sheffield. They are studded with live oak trees. The petitioner had done some work and had at that time driven trucks through the village of Sheffield. The excavation involved at the time of the trial was work which he expected to perform by using trucks which he proposed to drive around the village rather than through it. His property lay across one of these small canyons taking in a part of the slope on one side and a part of the slope on the opposite side. How deep he proposed to cut is not clear. However, he did propose to cut off the sloping banks on a grade of one and a half to one. There was evidence that the bottom of the canyon was approximately 100 feet above the village. How deep that cut was to sink in the gully or canyon does not appear. However, it distinctly appears that the work, if completed, would leave immediately adjacent to said village in the place of the canyon studded with live oak trees two naked sloping banks more or less in the form of the letter ''V,'' having a valley in between of approximately seven acres. In the work already done the operation of the steam shovel caused a noise that was heard throughout the village. The hauling that was done caused rock to be scattered on the roads and highways which impeded travel. Dust and broken rock rolled over the side of the road. Some broken rock rolled against the fences of the residential district and broke or loosened the boards on the fences. The petitioner claimed he was placing a private road over the lands of the scavenger company. The length of that new road is not stated. However, it was not claimed by the petitioner that he would not use any of the roads. It was shown in detail that he would be operating as many as fifteen loaded trucks and the empties over some of the roads. The village of Sheffield contains 198 residences which had cost from $4,500 to $7,500. The residences are occupied by young families. There are 180 children, many of them attending

schools that are closely adjacent to the roads which the petitioner expected to use. As the Superintendent of Streets testified: "I started to say as to the safety of the inhabitants of that neighborhood, Revere Avenue runs through about the center of Sheffield Village, and that is the street that would be used in hauling rock from this quarry under Mr. Angelus' original application. The street passes the land that has been set aside for a public school and is now used as a grade school. Also, right in front of a small nursery school. Naturally— the street bisecting the village, the children on one side would have to cross the road to get to the school. I made a computation of the hauling operation, based on the estimated quantity set forth in the application, and found that under ideal operating conditions, maximum capacity of one and one-half yard shovel, loading trucks as fast as they could be put in place, there would be fifteen loaded trucks and fifteen empty trucks passing up and down this street every hour. In other words, there would be a truck using the street every two minutes. To me that indicated a dangerous condition in a residence community where ordinarily you would not have that kind of traffic. Other elements of the general welfare clause and the health clause, I think, can be best answered by relating the particular use as proposed here. An operation of this magnitude can only be compared to an industrial operation. It is a heavy operation and it is customary to segregate those heavy industrial uses from residential uses. Ordinarily we recite in the list of uses that are permitted in an industrial zone and wind up with a stock covering clause which says, 'And other uses which, because of the existence of odor, dust, gas, smoke or excessive noise are obnoxious or objectionable.' That is the light in which we consider a quarry operation of this size, operation of heavy machinery, blasting, noise and dust is objectionable in a residential neighborhood."

There is not in the immediate neighborhood of Sheffield Village any railroad track of any kind or nature, nor are there any industrial plants operated by equipment which emit objectionable gases, scatter dust or create noises.

The petitioner has taken every step and means within his power under the laws and ordinances of the city of Oakland to obtain relief from the legislative body of that city, but he has been denied any relief whatever.

On the 22d day of September, 1943, he filed an application for a permit to excavate. Among other things that application recited that he desired to excavate and haul rock, sand, gravel, etc., from 29.50 acres of land adjacent to tract 537 in Sheffield Village; that said material was to be sold or given to persons whom applicant might select; it was to be hauled over Revere Avenue to Foothill Boulevard and then along such streets as the superintendent might permit; that the excavation was estimated at 897,000 cubic yards and that the purpose of the excavation was to grade and subdivide petitioner's tract into lots according to a contour map "filed herewith." No such map is before us. The application further provided that the excavating would be done mechanically and blasting when necessary slope $1\frac{1}{2}$ to $1\frac{1}{3}$ super-elevation. Bull-'dozer shovels will be used to dig. Hauling will be by trucks. After granting a permit excavation to be commenced within ten days and to be completed in five years.

When that application was filed it was referred to Mr. Frickstad, the superintendent of streets. Under date of October 15, 1943, he reported that "under the application 7 acres would be reclaimed to a grade suitable for building and the remainder will lie on a $1\frac{1}{2}$ to one slope facing to the southeast. The land so reclaimed would be relatively unsuitable for building purposes. The excavation is therefore obviously the major feature for the project. An excavation project in this locality is not desirable. Heavy blasting will no doubt be required with its accompanying possibilities of hazard and damage to persons and property in the neighborhood. The streets will be damaged if not wholly destroyed, as they are not designed for such heavy hauling purposes. The project commenced and left uncompleted would be even worse in all respects than the completed project. The excavation's costs being of such great magnitude the completion of the project is dependent upon a market for the excavated material. This market is extremely uncertain, and I would say for the next five years or even a greater period, will be unable to absorb the quantities of excavated materials offered within that time. Therefore if for any reason you decide to grant the permit of the petitioner it is suggested that the bond be sufficient to guarantee the completion of the project in accordance with the terms of the application. The cost of excavating this ma-

terial and carrying it to a place suitable for deposit will be a minimum of 50c per cubic yard and may easily be $1 per cubic yard. An adequate bond for this purpose would be not less than half a million dollars, and such bond is entirely justified, in my opinion, for the protection of the surrounding properties and the public in general.'' On the hearing of the application the same was denied.

Mr. A. R. Rowell, attorney for Sheffield Village Home Owners Association, testified that the petitioner's property was subject to a deed of restrictions filed March 10, 1939. One of those restrictions was ''No portion of said property . . . shall be used except for private residential purposes.''

A district map, together with a copy of Ordinance 474 C.M.S., the ordinance under attack in the instant case, were introduced. Evidence was also introduced tying the calls of said map to the petitioner's tract. Mr. W. E. Alworth testified that he had been city planning engineer of the city of Oakland since September 1, 1943. Prior to that he had been from 1928 city planning engineer of Pasadena. He testified that he made an examination of the application above mentioned and thereafter made a report to the city manager's office. The contents of that report are not contained in the record, however he testified that the petitioner's property falls within district ''A,'' a residence district as defined by the zoning ordinance. ''The homes are all single family dwellings, all above average in cost, all well maintained, with lawns and shrubbery and flowers in each yard. . . . The subdivision (Sheffield Village) itself is very well done. It is designed to discourage through traffic in the subdivision. It makes provision for the shopping center at the edge of the subdivision so that no through traffic will need to go along the residential streets. There is provision for a school ground. There is land set aside for tennis courts. The streets are curved. The lots are adequate in size, in width and in length. The streets are planted with street trees. The whole development is an exceptionally fine residence development. A quarry operated where petitioner proposes to operate would have an effect on the residence area. As to safety for instance, the operation of the quarry would require the use of Revere Avenue through Sheffield Village. This street runs through about the center

of the village. I am talking about the application on which I made my report." Mr. Litt, a resident of Sheffield, testified regarding the operation of trucks. "Well, this village as a whole, as you know, is located in sort of a bowl shape valley, and when that steam shovel operated you could hear it going in almost any part of the village. As to the trucks going through the village, up and down the street, the village is somewhat on a slope. The trucks would have to shift gear several times, usually heavy trucks, and every time the trucks were coming or going through the village either first or second gear, and there was necessarily grinding, because they were using their gears for a brake, resulting in back-fire and general noise which results in using the gears as brakes."

Many points were made by counsel when filing briefs. However, the petitioner clarifies that situation by stating in his reply brief: "Comprehensive zoning is a valid exercise of a muncipality's police power; lack of reasonableness is the only ground upon which such a zoning ordinance may be attacked; particular occupations or businesses even though not injurious to public health, safety, or general welfare, may nevertheless be excluded from certain districts, when the same can be carried on elsewhere. If an ordinance is based on a proper exercise of police power the delegation of power thereunder to designated city officials to determine whether applications for a permit shall be granted or denied is proper. That 'financial hardship alone does not entitle owners of property to relief,' is conceded and requires no discussion. Petitioner is not applying for a writ of mandate." Again, quoting the petitioner, "The sole question is, may a municipality prohibit the removal of surface soil material from private property under the guise of its police power?"

The petitioner answers the question as just stated in the negative. We think he is in error. (*Miller* v. *Board of Public Works,* 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479], and other cases all of which will be noted below.) The petitioner cites and relies on *In re Kelso,* 147 Cal. 609 [82 P. 241, 109 Am.St. Rep. 178, 2 L.R.A.N.S. 796] and *In re Throop,* 169 Cal. 93 [145 P. 1029]. We think neither case is pertinent because neither case involved a zoning ordinance. He also cites and relies on *People* v. *Hawley,* 207 Cal. 395 [279 P. 136]. That case is more nearly in point but is to be distinguished in

its facts. Three separate actions were brought regarding certain excavations being made by the Los Angeles Rock and Gravel Company. One action involved a nuisance *per se* and was brought pursuant to the provisions of section 731, Code of Civil Procedure. The other actions involved provisions of the zoning ordinances of Los Angeles. All three actions were tried together. The trial was conducted primarily as a trial of facts. In the action involving a nuisance *per se* the trial court made findings including injunctions affirmative and injunctions negative which resulted in allowing the defendant to proceed but in a legal and proper manner. As to the other two actions the trial court found that to permit the company to continue its excavation operations on its own land subject to the conditions imposed upon said operations by the judgment and decree first mentioned would not result in any substantial injury to any adjoining property or to persons residing or owning property in the near vicinity of the lands of the owner and that any ordinance of said city which would enjoin and prohibit the company from thus using its property was void. On page 410 the court said:

"In this state the law governing the power of municipalities to enact reasonable zoning legislation has been definitely settled by the recent decisions of this court, notably the cases of *Miller* v. *Board of Public Works,* 195 Cal. 477 [38 A.L.R. 1479, 234 P. 381], *Zahn* v. *Board of Public Works,* 195 Cal. 497 [234 P. 388], *In re White,* 195 Cal. 516 [234 P. 396], and *Pacific Palisades Assn.* v. *City of Huntington Beach,* 196 Cal. 211 [40 A.L.R. 782, 237 P. 538]. These decisions with others of this and the several District Courts of Appeal establish without question that the right to zone may be resorted to by municipalities upon a proper invocation of the police power. 'But such zoning must be reasonably necessary and reasonably related to the health, safety and morals or general welfare of the community.' (*Pacific Palisades Assn.* v. *City of Huntington Beach, supra,* p. 216.) Further, the court in the opinion in that case says (p. 217): 'Ordinances having that effect must be reasonable, and must be for the purpose of protecting the public health, comfort, safety, or welfare. Every intendment is to be made in favor of the lawful exercise of municipal power making such regulations, and it is not the province of courts, except in clear cases, to interfere

with the exercise of that authority. But, as was recently said by the Supreme Court of the United States, "While property may be regulated to a certain extent if regulation goes too far it will be recognized as a taking." (*Pennsylvania Coal Co.* v. *Mahon,* 260 U.S. 393, 415 [28 A.L.R. 1321, 67 L.Ed. 322, 43 S.Ct. 158, see, also, Rose's U.S. Notes].) Therefore, notwithstanding this general grant of power, it is a thoroughly well-settled doctrine that municipal by-laws, and ordinances undertaking to regulate useful business enterprises, are subject to investigation in the court, with a view to determining whether the law or ordinance is a lawful exercise of the police power; or whether, under the guise of enforcing police regulations, there has been an unwarranted and arbitrary interference with the right to carry on a lawful business, to make contracts, or to use and enjoy property. (*Dobbins* v. *Los Angeles,* 195 U.S. 223 [49 L.Ed. 169, 25 S.Ct. 18] ; *In re Application of Throop,* 169 Cal. 93, 99 [145 P. 1029] ; *Curtis* v. *City of Los Angeles,* 172 Cal. 230, 234 [156 P. 462].)' '' Bearing said rules in mind in that case the trial court heard a large amount of evidence and made findings among others including the following. That the work which the defendant was doing when done properly under the findings made by the trial court would be a positive benefit to the adjoining property by controlling flood waters and carrying them off; as to the objectionable noise the trial court found that if the work was done as directed by said findings that the noise would be less than the noise made by the equipment used on the Santa Fe, Union Pacific, and Pacific Electric Railways which operated railroads immediately adjacent to and along the entire length of the Arroyo Seco in which the defendant was operating; and that the defendant proposes to conduct the business and excavations in such a way as to create no menace to public health, safety or morals.

Petitioner also relies on *Hadacheck* v. *Sebastian,* 239 U.S. 394 [36 S.Ct. 143, 60 L.Ed. 348]. Hadacheck owned a brickyard in the city of Los Angeles. The city enacted an ordinance prohibiting the manufacture of brick in that territory. Nevertheless Hadacheck proceeded. He was arrested and convicted under the terms of the ordinance. He took out a writ of habeas corpus and in presenting his case he contended that he was conducting a lawful business in a lawful manner.

The prosecution introduced evidence to the effect that the brick yard was in a neighborhood that had become built up as a distinctly residential section and that the residents were seriously annoyed by the petitioner's operations. The court held that the ordinance was valid and that the petitioner was legally found guilty of violating it.

The petitioner also relies on *Stone* v. *Kendall* (Tex. Civ. App.), 268 S.W. 759. The facts in that case are much the same as in *In re Kelso, supra.* Kendall owned a gravel pit at Waco in the State of Texas. The city passed an ordinance prohibiting the removal of soil. The owner prepared a complaint setting forth that the officers of the city were about to enforce the provisions of said ordinance. The record does not show the allegations of that complaint. In open court the owner presented the complaint and asked for an injunction. The city officers did not file an answer but objected to the issuance of the injunction. The trial court overruled the objection and issued the injunction. On appeal the court of civil appeals stated the condition of the record and then said: "Can it be said that the excavation, removal, and sale of gravel by appellees in the operation of said gravel pit will in itself necessarily, or even probably, injuriously affect the health, safety, comfort, or welfare of the inhabitants of said city? We think not."

*Village of Terrace Park* v. *Errett,* 12 F.2d 240, is more nearly in point. However, in that case the court states facts showing that the plaintiff was the owner of certain farm lands; that the village of Terrace Park adopted a zoning ordinance covering a strip of territory including said farm land. The plaintiff sought to remove certain gravel. Before doing so he commenced an action to restrain the Village from interfering with his work. The facts show that the moving of the gravel was beneficial and not injurious to the inhabitants of the village. The court found "Upon a full consideration of all of this evidence we have reached the conclusion that the health of the citizens of Terrace Park will not be imperiled by the operation of this plant at such a remote distance from their homes, and that the possibilities of discomfort and annoyance are more imaginary than real, and in no wise to be compared with the inconvenience or annoyance of the noise and soot of the trains that pass through this village

every 30 minutes." Thereupon the court affirmed the issuance of an injunction in behalf of said owner.

*Bartsch* v. *Ragonetti,* 123 Misc. 923 [207 N.Y.S. 142], is also relied on by the petitioner. It was a case involving a zoning ordinance. No specific section of the ordinance is set forth. The acts of the owners were temporary in their nature. The court said:

"It appears by the evidence in this case that there have been some structures of a temporary nature which have been erected by these defendants upon portions of this land, such as small shanties and a small office, or something of that kind, and that these may be thought or claimed to be violations of the provisions of this zoning ordinance by the introduction of business buildings in a residential district. But, as before, they are not permanent in their nature; they are temporary, and purely adjuncts and accessories to the work that is being prosecuted, in the removal of sand from the defendants' land, and so I think they come within the same rule as regards the sand itself. When the sand shall have been removed and its place filled with earth, unquestionably these structures will not be permitted to remain there, and after their use has ceased, if the defendants choose to leave them there, resort may be had to the courts at that time to compel their removal."

It should be noted that said case was a decision by the Supreme Court and not by the highest court of the State of New York.

*People* v. *Linabury,* 209 N.Y.S. 126, involved the zoning ordinance of the city of New York. It involved a construction of section 3 of said ordinance. Said ordinance contained nothing prohibiting excavations. It was contended that excavations were impliedly prohibited. The court held otherwise.

In his closing brief the petitioner states: "The cases cited by respondent in support of his contention are *Town of Lexington* v. *Menotomy Trust Co.* (Mass. [304 Mass. 283 (23 N.E. 2d 559)]) and *West Bros. Brick Co., Inc.* v. *City of Alexandria* (Va. [169 Va. 271 (192 S.E. 881)]). Assuming, without admitting, that these decisions support respondent's position, we respectfully state that they are contrary to: *In re Kelso,* 147 Cal. 609 [82 P. 241, 109 Am.St.Rep. 178, 2 L.R.A.N.S. 796]; *In re Throop,* 169 Cal. 93 [145 P. 1029]; *People* v. *Hawley,* 207 Cal. 395 [279 P. 136]; *In re Hadacheck,* 239 U.S. 394 [36 S.Ct. 143, 60 L.Ed. 348]; *Village of Terrace Park*

v. *Errett,* 12 F.2d 240; *Bartsch* v. *Ragonetti* [123 Misc. Rep. 903], 207 N.Y.S. 142 (Affd. 214 App. Div. 799, 210 N.Y.S. 825); *People* v. *Linabury,* 209 N.Y.S. 126; *Stone* v. *Kendall,* 268 S.W. 759 (Tex. [Civ.App.])." With that conclusion we do not agree. As shown above we have no quarrel with any one of those cases. However, we do not concede that any one of them is in conflict with the cases cited from the brief of respondent. *West Bros. Brick Co.* v. *City of Alexandria,* 169 Va. 271 [192 S.E. 881], as stated above, was decided by the Supreme Court of Virginia. It is a leading case with reference to excavations in gravel pits. It treats all of the problems involved in the instant case and many others. It cites with approval *Zahn* v. *Board of Public Works,* 274 U.S. 325 [47 S.Ct. 594, 71 L.Ed. 1074], which approved the decision of our Supreme Court, 195 Cal. 497 [234 P. 388]. Moreover, it distinguished *In re Kelso,* 147 Cal. 609 [82 P. 241, 109 Am. St. Rep. 178, 2 L.R.A.N.S. 796]. Finally, it closed with this paragraph:

"An eighteen-acre clay pit in a growing town, contiguous either to residences or business establishments, would doubtless be objectionable. Where it is forbidden by statute (a zoning ordinance), the burden of showing that it is necessary, or even desirable, as adding to the comfort and welfare of the city, does not rest upon it. Statutes are presumed to be valid expressions of legislative will and stand until this is disproven."

After the decision of the Supreme Court of Virginia was rendered an appeal was taken to the United States Supreme Court. That court dismissed the appeal because the record presented no federal question. (302 U.S. 781 [58 S.Ct. 480, 82 L.Ed. 603].) Regarding excavating gravel pits within territory covered by a zoning law other decisions are in accord with the case of West Bros. Brick Co. (*Town of Lexington* v. *Menotomy Trust Co.* (1939), 304 Mass. 283 [23 N.E.2d 559]; *Town of Saugus* v. *B. Perini & Sons* (1940), 305 Mass. 403 [26 N.E.2d 1].)

As we stated in the beginning in *In re Kelso, supra,* did not involve a zoning ordinance, however *Miller* v. *Board of Public Works,* 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479], did. Therefore in the very beginning of that case, on page 483, the court quoted the provisions of the enabling act of 1917 which authorized the enactment of zoning ordinances. Then at page 484 the court said:

"In short, the police power, as such, is not confined within the narrow circumspection of precedents, resting upon past conditions which do not cover and control present-day conditions obviously calling for revised regulations to promote the health, safety, morals, or general welfare of the public. That is to say, as a commonwealth develops politically, economically, and socially, the police power likewise develops, within reason, to meet the changed and changing conditions. What was at one time regarded as an improper exercise of the police power may now, because of changed living conditions, be recognized as a legitimate exercise of that power. This is so because: 'What was a reasonable exercise of this power, in the days of our fathers may today seem so utterly unreasonable as to make it difficult for us to comprehend the existence of conditions that would justify same; what would by our fathers have been rejected as unthinkable is today accepted as a most proper and reasonable exercise thereof.' (*Streich* v. *Board of Education*, 34 S.D. 169 [Ann. Cas. 1917A, 760, L.R.A. 1915A, 632, 147 N.W. 779].)'' And again on page 490 the court said: ''It is scarcely necessary to reiterate here the well-recognized principle that courts are loath to substitute their judgment as to the necessity for a particular enactment for the legislative judgment as to the need of such enactment with reference to the exercise of the police power. A large discretion is vested in the legislative branch of the government with reference to the exercise of the police power (*Mehlos* v. *Milwaukee*, 156 Wis. 591 [Ann. Cas. 1915C, 1102, 51 L.R.A. N.S. 1009, 146 N.W. 882); *Carter* v. *Harper, supra* [182 Wis. 148 (196 N.W. 451)].) Every intendment is to be indulged by the courts in favor of the validity of its exercise, and unless the measure is clearly oppressive it will be deemed to be within the purview of that power. It is only when it is palpable that the measure in controversy has no real or substantial relation to the public health, safety, morals, or general welfare that it will be nullified by the courts. The courts may differ with the Legislature as to the wisdom and propriety of a particular enactment as a means of accomplishing a particular end, but as long as there are considerations of public health, safety, morals, or general welfare which the legislative body may have had in mind, which have justified the regulation, it must be assumed by the court that the legislative body had those considerations in mind and that those

considerations did justify the regulation. (*State ex rel. Civello* v. *City of New Orleans, supra,* [154 La. 271 (97 So. 440, 33 A.L.R. 260)].) In *Ex parte Hadacheck, supra,* the court held in effect that, when the necessity or propriety of an enactment was a question upon which reasonable minds might differ, the propriety and necessity of such enactment was a matter of legislative determination." Those passages make it clear that what was not proper practice at the time the court decided *In re Kelso, supra,* was by virtue of the enactment of the statute of 1917 a proper enactment within the purview of the police power.

The petitioner's counsel quotes testimony of petitioner and argues that under the terms of the ordinance the result will be that petitioner's property will stand confiscated. That claim rests on the assertion that petitioner's lands are good for nothing but a pit of surplus filling material. That argument falls when one examines the exhibits introduced in evidence. The photographs show said lands to be sightly building lots.

In the instant case under the facts it now appears, and when the legislative body adopted the ordinance we must assume that the facts then showed, or from the facts it could reasonably be apprehended, that the commencement or carrying on of an undertaking such as the petitioner seeks to carry on would result in objectionable noise and turmoil; would create and cause the spreading of clouds of dust; that rock would be scattered on the roads, streets and highways and would greatly impair their usefulness; that the wear and tear of the streets not constructed or intended for heavy traffic would result in the deterioration of said streets, roads and highways; that the hills hereinabove mentioned were in place when the zoning plan was adopted; and that the matter of the future use thereof was manifestly then before the municipal bodies preparing the ordinance under attack. Moreover, that the proposed excavation will clearly result in creating a scarecrow in the face of the inhabitants of Sheffield Village and by reason of the precipitous banks numerous slides will occur in the wintertime greatly enhancing the objectionable appearance of the excavated territory. Under such circumstances it is apparent that no court may say that the minds of reasonable men may not differ as to the advisability of allowing

such excavation.  Having reached that conclusion, under all of the authorities the power of the courts is limited by the determinations heretofore made by the legislative department of the municipality.  It follows that it may not be said the ordinance under attack is invalid.

The writ is discharged and the petitioner is remanded to custody of the Chief of Police of the City of Oakland, State of California.

Nourse, P. J., and Spence, J., concurred.