## COUNTY COMMISSIONERS OF HOWARD COUNTY et al. *v.* MERRYMAN et al.

[No. 172, September Term, 1959.]

316

*Decided April 19, 1960.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Bernard F. Goldberg,* with whom were *James T. Clark,
Reginald D. Malloy* and *Edwin S. Panetti,* on the brief, for
the appellants.

*C. Orman Manahan* for the appellees.

HORNEY, J., delivered the opinion of the Court.

This is an appeal from a decree which declared the rezoning
resolution of the Board of County Commissioners of Howard
County (the County Commissioners)—adopted March 10,
1959—null and void and enjoined the Cinder and Concrete
Block Corporation (the Block Company or proponent) and
others from putting the purported rezoning into effect and
from using the "rezoned" property for any purpose not per-
mitted on properties having a residential classification. The
Block Company and the County Commissioners seek a re-
versal of the decree.

The property, known as the "Kraft Farm" containing 92

acres of land, which the County Commissioners, against the recommendation of the Planning Commission of Howard County (Planning Commission),[1] reclassified from an "R" [Residential] district to an "M-1" [Light Manufacturing] district, is located in the first election district of the county on the easterly side of a 30-foot right of way, commonly known as Mullineaux Road. This private road, which, as presently extended by another recently acquired wider right of way, runs from Montgomery Road to Meadowridge Road, is also used by other owners of residential properties in the area. The northernmost 600 feet of the property—left as a buffer zone between the main tract and the residential area to the north —was not rezoned and retains its original residential classification. The 200-foot strip along the westernmost boundary of the whole tract—recently sold by the Block Company to the State Roads Commission (Roads Commission) for an extension of Dorsey Road [Route 176] if and when constructed —was also not rezoned. The plats in the record extract show that if the rezoning is permitted to stand, the effect would be to create an "island" for light manufacturing use in the middle of an otherwise extensive "sea" of residential uses.

The rezoned property, as well as the surrounding area, was classified as residential by the County Commissioners under the original zoning resolution adopted January 12, 1954, and

---

1. The Planning Commission recommended denial of the petition for rezoning because (i) there was no need for additional M-1 zoning in the area, (ii) because there were large areas of vacant land zoned M-1 and M-2 adjacent to and south of the Baltimore-Washington Boulevard, (iii) because sand and gravel from the land in question could be transported over the proposed extension of Route 176 to a plant located in one of the M-1 or M-2 zones mentioned—[in the meantime a recently acquired right of way connecting with Meadowridge Road was available for the purpose] —(iv) because the area adjacent to and surrounding the property was topographically more suitable for residential than industrial development, (v) because rezoning of the property would retard future residential development of the area, (vi) because the property was in the midst of an "R" district and rezoning would constitute spot zoning, and (vii) because denial of rezoning would not preclude licensed removal of sand and gravel deposits or deny to the owners the most efficient use of the land.

until now has retained the same classification. However, on May 9, 1955, the Board of Zoning Appeals of Howard County, upon application for the privilege, granted a permit to operate a sand and gravel pit on the rezoned premises subject to certain definite limitations and restrictions, among which was one to the effect that the operation should be confined "to the hill containing sand and gravel" and that the hill should be cut only to the extent of the adjacent contours, to the end that the property would be "more suitable for residential development" in the future. Another restriction confined the pit traffic over Mullineaux Road to sixteen loads of sand and/or gravel a day and limited the number of trucks to two.

On April 7, 1958, upon a rezoning application similar to the present one, the three man Board of County Commissioners—two of whom are no longer members—refused to rezone because it found as a fact that there had been no substantial change in the character of the neighborhood since the date [January 12, 1954] of the original rezoning. But, on March 10, 1959, within less than a year after rezoning had been denied, the incumbent County Commissioners found evidence of "substantial change in the area" and granted the rezoning which is the subject of this controversy. The action of the County Commissioners in both instances was appealed to the Circuit Court for Howard County. The refusal to rezone at the first hearing was appealed by the proponent and was affirmed by the circuit court, but there was no appeal to this Court. The grant of rezoning at the second hearing was appealed by the protestants and was reversed by the circuit court, and, as stated, the proponent prosecuted this appeal.

Asserting damage in that their respective properties would be cheapened and depreciated in value if the rezoning were allowed to stand, this proceeding was instituted by M. Pearce Merryman and others (the protestants), alleging that the action of the County Commissioners was "unreasonable, arbitrary, unlawful and unconstitutional."

There was an abundance of evidence on behalf of the protestants to show that there had been no substantial change in

the character of the neighborhood since the original zoning other than a considerable increase in the development of the area for residential use. In addition to testimony that the rezoning would cause damage to the properties of the protestants, there was also evidence that use of the rezoned area for manufacturing purposes would increase traffic not only on the narrow Mullineaux Road but on the adjacent state roads as well.

On the other hand there was evidence that there had been changes in the neighborhood in that an immense deposit of sand and gravel had been "discovered" on the rezoned premises, which was then being mined for such resources under the special limited and restricted permit issued in May of 1955. There was also evidence with respect to the proposed construction of a new highway. In December of 1955 the Roads Commission entered into an agreement with the County Commissioners looking toward an extension of Route 176 or Dorsey Road in an effort to relieve some of the traffic congestion on Montgomery Road and other state highways in the general area. It was agreed that the extension would be a controlled access dual highway on a 200 foot right of way providing for access thereto at its intersection with Mullineaux Road for the convenience of the Block Company and other property owners abutting on the private road. At the first hearing the plans with respect to the construction of the proposed extension had been tentative both as to location and execution, but at the second hearing, in addition to evidence that the Roads Commission had purchased or agreed to purchase several tracts of land in the area, including a part of the Kraft Farm, there was testimony that the proposed route had been surveyed and staked out and that bids were anticipated by not later than the early part of 1960. It was not shown, however, that funds for the project had been allocated or would be forthcoming in the near future. There was also evidence that rezoning from residential to light manufacturing would not further depreciate the value of surrounding residential properties or affect the public health, safety, morals and general welfare of the residents in the area.

Furthermore, while the Planning Commission had recom-

mended rejection of reclassification, its director testified that the commission had recently determined, as a result of a county-wide survey, that the county would need additional acreage for industrial use within the next 20 or 25 years, but the director did not indicate or even suggest that the rezoned area ought to be a part of the additional acreage needed for that purpose. However, two zoning experts, testifying on behalf of the proponent, were of the opinion that a part of the Kraft Farm was well suited for industrial development since it provided a logical and reasonable extension of the existing M-1 zone along the Baltimore-Washington Boulevard about a mile away. The report of the Planning Commission, however, had recommended denial of rezoning because, among other reasons, there were "at present large areas of vacant land zoned M-1 and M-2 adjacent to and south of" the boulevard.

It was on this testimony that the County Commissioners based their decision that there had been a substantial change and passed the resolution granting the rezoning. The chancellor, however, concluded that "the action of the Board [of County Commissioners] in doing, less than a year later, on scanty additional evidence, what they had on good grounds initially refused to do, falls below the point of being 'fairly debatable' to the level of being arbitrary."

On this appeal the Block Company contends that the chancellor was not justified in finding that the action of the County Commissioners was arbitrary because the question of whether there had been a change in the character of the neighborhood was fairly debatable. Apparently the chancellor was of the opinion that a change of mind in such a short period on such new evidence as was produced at the second hearing did not justify a reclassification. Or it may be that the chancellor thought that the decree affirming refusal of rezoning in the first instance was *res judicata* to the order granting the rezoning in the second instance. Whatever may have been the basis ·for the decision of the chancellor, we think we must consider—since they cannot be wholly disregarded—the cumulative effect of such changes as there may have been between the date of the original zoning and the date of the second hear-

ing. *Muhly v. County Council*, 218 Md. 543, 147 A. 2d 735 (1959). The real question therefore is not whether the complete about-face was warranted, but whether the aggregate changes in the character of the neighborhood between January 12, 1954, and March 10, 1959, were such as made the question of rezoning fairly debatable. No question as to *res judicata* was raised in this Court.

What, then, does the record disclose regarding changes? Other than the evidence with respect to the "discovery" of extraordinary deposits of sand and gravel, the proposed highway extension and the proposed industrial replanning—hereinafter separately discussed—the only evidence which had a legitimate bearing on the decision of the County Commissioners in this case was the effect, good or bad, of existing nonconforming uses on the development of the area for residential purposes, and the effect of rezoning, good or bad, on the surrounding properties and the public interests with respect to health, safety, morals and general welfare. These facts standing alone fall far short of establishing sufficient change to justify rezoning.

Other evidence which was considered—such as the doubling of traffic in adjacent areas, the planning for other highways, expressways and beltways in the county, the extension of the industrial strip zoning along the Baltimore-Washington Boulevard, the eventual availability of public water in the general area, the need for the products made by the proponent, and the need for the revenues the proponent and other industrial and commercial interests would pay and thus offset the deficit in taxes paid by the owners of residential properties—certainly did not justify the action taken by the County Commissioners.

With respect to the alleged "discovery" of immense deposits of sand and gravel in an area where it is common knowledge that sand and gravel exist in abundance, the record fails to show with certainty when the immensity of such deposits was discovered. It is apparent, however, that there was at least some knowledge of the vastness thereof when the license to mine the deposits was issued inasmuch as the pit was "confined to the *hill* containing sand and gravel." [Emphasis added.] The discovery, then, could have been either before or after May 9, 1955, the date on which the permit was granted.

The purpose of containment was to preclude cutting of the hill to an extent greater than the adjacent contours. The proponent also urged that the temporary privilege it is presently enjoying to remove sand and gravel from the premises constituted a change in the character of the neighborhood; that the specifically limited increase in traffic [sixteen loads of sand and gravel in two trucks per day] engendered by the mining operation did likewise; and that the highest and best use of its property in view of the abundant natural resources required industrial rezoning. The evidence with respect to the immensity of sand and gravel deposits on one property in the middle of a large residential district where such deposits are indigenous to the general area is not enough, in and of itself, to show such mistake or change as would justify industrial rezoning. Nor does the exercise of the mining license—which is at least temporary in character if not revocable—and the increase in traffic caused by such operation, indicate a permanent change in the character of the neighborhood. The denial of rezoning will not preclude the proponent from continuing to remove sand and gravel from the Kraft property. All the proponent has been denied that it did not have is the right to build a permanent cinder and concrete block plant in the middle of a residential area. The denial of rezoning for that purpose was not improper. Cf. *Davidson County v. Rogers*, 184 Tenn. 327, 198 S. W. 2d 812 (1947), where prohibition of stone quarrying in an area of 270 acres owned by the defendants, which was a part of 1250 acres classified as residential, was deemed to be proper because, being in effect an original zoning where there was no question of mistake or change, the matter was fairly debatable.

Other than the testimony with respect to some progress made toward the eventual construction of the proposed extension of Route 176, which in and of itself was not enough, we find no evidence that the area had been erroneously zoned in the first instance or that there had been any change in the character of the area since. The status of the contemplated streets which were in question in *Nelson v. County, etc., Montgomery County*, 214 Md. 587, 136 A. 2d 373 (1957) and *Missouri Realty, Inc., v. Ramer*, 216 Md. 442, 140 A. 2d 655

(1958) concerned far different factual situations than those present here. In the *Nelson* case the *widening* of the street in question was considered to be in immediate prospect and in the *Ramer* case the *opening* of the proposed new street was imminent in that funds had been budgeted and advertising for bids would begin in a week or so. As we recently stated in *Trustees of McDonogh v. Baltimore County,* 221 Md. 550, 158 A. 2d 637 (1960), in reference to a change that has part of a comprehensive rezoning (which, of course, looks to the future as well as to the present), the legislative body is entitled to consider proposed new highways or proposed improvements to existing highways in determining the proper classification of property when construction thereof is "reasonably probable of fruition in the foreseeable future." In the case at bar the rezoning was of a single property and the significance of the road has its bearing on whether there had occurred an actual change in conditions much as in *Bd. of Zoning Appeals v. Bailey,* 216 Md. 536, 141 A. 2d 502 (1958). There [in *Bailey*], the location of the expressway was virtually a certainty in that, in addition to having been surveyed and staked out, most of the rights of way had been acquired. But, in that case where there was no conclusive evidence that the highway, if and when constructed, would affect changes in the character of the neighborhood after its completion, we held that we did not reach the question "as to whether a contemplated change in conditions is sufficient to justify a rezoning." Clearly we do not reach that question here and for the same reason. Nor are we presently concerned with the effect of the proposed extension of Route 176 as a substantial physical barrier or line of demarcation between the proposed industrial or commercial use to the east and the residential uses to the north and west. Cf. *Hewitt v. County, etc., of Baltimore County,* 220 Md. 48, 151 A. 2d 144 (1959). Moreover, absent provision for more adequate traffic facilities in the immediate area, there is little doubt that a grant of rezoning—which would have the effect of removing the existing restrictions on daily traffic under the special mining permit—would increase traffic on the narrow Mullineaux Road to such an extent that failure to heed such

readily foreseeable conditions might possibly make the rezoning arbitrary. *Price v. Cohen,* 213 Md. 457, 132 A. 2d 125 (1957).

The proposed industrial planning, stressed by the proponent to support its position, is not yet out of its embryonic stage. It is true that the recent county-wide survey did disclose a need for additional industrial areas, but that fact, absent other factors which are missing here, could not possibly justify a rezoning of a part of the subject property from a residential to a light manufacturing use. Such piecemeal rezoning for industrial uses was not only impracticable and undesirable under the circumstances but may well be wholly inconsistent with the long-range plan which the Planning Commission will no doubt recommend in due course in connection with industrial replanning. It may be that the County Commissioners will see fit to approve a comprehensive industrial rezoning plan for the county as a whole to be overlaid on its present original zoning or it may decide—as Baltimore County has done and is doing—to embark upon a comprehensive rezoning plan, either county-wide or district by district, which would encompass all land use classifications, or it may adopt some other plan which to them may seem proper. In any event, until such time as some such new comprehensive plan has been approved and adopted, a grant of rezoning for any purpose must be made in accordance with existing rules of law.

There is, of course, a presumption that all rezoning is reasonable, but in piecemeal rezoning, such as was attempted in this case, there is a counter-presumption that the original zoning, or the comprehensive rezoning, as the case may be, was well planned and designed to be reasonably permanent which may be overcome only by proof that there was either a basic mistake in the original zoning or comprehensive rezoning or a substantial change in the character of the neighborhood. If neither is shown, the presumption of the reasonableness of the rezoning would be destroyed. Moreover, when there is no basis for reasonable debate as to whether the legislative body has properly applied the law to the facts, a court can and should declare the legislative action to be arbitrary, capricious, discriminatory or illegal. *City of Baltimore v. N. A. A. C. P.,* 221 Md. 329, 157 A. 2d 433 (1960).

Since the evidence produced, even when considered as a whole, was insufficient to justify reclassification, we hold that it was proper for the chancellor to set aside the rezoning and to issue prohibitory injunctive relief.

*Decree affirmed, the appellants to pay the costs.*