[L. A. No. 26566. In Bank. Apr. 12, 1962.]

CONSOLIDATED ROCK PRODUCTS COMPANY et al., Plaintiffs and Appellants, v. THE CITY OF LOS ANGELES, Defendant and Respondent.

Donald J. Dunne for Plaintiffs and Appellants.

Roger Arnebergh, City Attorney, Bourke Jones and Claude E. Hilker, Assistant City Attorneys, for Defendant and Respondent.

Peter T. Rice as Amicus Curiae on behalf of Defendant and Respondent.

DOOLING, J.—This is an appeal from a judgment for defendant in an action seeking declaratory relief and to enjoin defendant from enforcing a zoning restriction alleged to be unconstitutional insofar as it applies to prevent rock and gravel operations on plaintiffs' property.

Plaintiff Valley Real Estate Company is the owner and Consolidated Rock Products Company is the lessee of 348 acres of land situated in the watercourse known as the Tujunga Wash, and lying northeasterly (upstream) of Hansen Dam in the San Fernando Valley. This property—about two miles long and one-quarter mile wide—runs in a generally east-west direction and is divided approximately in the center by Foothill Boulevard, a north-south roadway at that point. The property forms substantially the apex of the Tujunga Cone, the second largest alluvial cone of rock, sand and gravel in Los Angeles County. The Tujunga Wash from the eastern to the western termini of the subject property is bordered on the north by the base of the mountains and on the south by bluffs of low hills except for relatively narrow plateaus on either side above the level of the land. The property is composed of rock, sand and gravel to a depth of about 40 feet. It is isolated from land presently being used for other purposes and is situated in a natural amphitheater surrounded by the rugged terrain of the Angeles National Forest on the north, by Tujunga Canyon on the east, by Hansen Dam and its debris basin on the west, and by high hills and cliffs on the south.

Except for the Livingston Rock and Gravel Plant on 125 acres contiguous to the westerly portion of plaintiffs' property—an operation conducted since 1931, now substantially depleted in the course of some 30 years' activity, and with but a doubtful number of remaining years left for economic extraction—rock and gravel operations in the Tujunga Wash have been confined to the area *downstream* from Hansen Dam. Since 1946 defendant City of Los Angeles has not created any new rock and gravel districts *upstream* from Hansen Dam but has specifically denied applications for such designated districts upon premises immediately adjacent to plaintiffs' property.

The twin residential communities of Sunland and Tujunga adjoin plaintiffs' property, with their mainly developed portions lying east and southeast thereof. In recent years the trend of development in these communities has been in a westerly direction toward plaintiffs' property and along and upon the bluffs north and south thereof.

Plaintiffs' property—348 acres—is zoned for agricultural and residential use; and rock, sand and gravel operations are prohibited thereon. During the trial, the trial judge pursuant

to stipulation of counsel made an extensive tour of plaintiffs' property and the surrounding area.

The trial court found that the subject property has great value if used for rock, sand and gravel excavation but "no appreciable economic value" for any other purpose, and in view of the "continuing flood hazard and the nature of the soil," any suggestion that the property has economic value for any other use, including those uses for which it was zoned, "is preposterous." With respect to the effect that rock and gravel excavating operations would have on nearby residential communities, the trial court found that the "creation of dust for air-borne convection" could be "reduced to a point of pollution below an acceptable standard," that the "inevitable" noise could be controlled to the point where it would be "minimal," that there would be no extraordinary danger to children; and in summation, that the "business of excavating . . . rock, sand and gravel and activities incidental and related thereto can be conducted on the plaintiffs' said property with compatibility to adjacent properties and with minimal detriment to the living amenities or health conditions of the inhabitants of adjacent properties or in the general area and without probable depreciation in property values to the adjacent properties."

While expressing these views on vital matters affecting the "public health" of the adjacent communities, the trial court further found that they "are all factors which, in their totality, the legislative body [the Los Angeles City Council] may properly consider and act upon" and that "reasonable minds might differ and have differed upon these" factors.[1]

The trial court also found that "the Sunland-Tujunga area . . . has a national reputation as a haven for sufferers from respiratory ailments and is inhabited by many such sufferers and that a considerable portion of its economy is based upon such reputation"; that "the possible advent of a substantial rock, sand and gravel extraction and processing operation upon the subject property has caused considerable apprehension to the residents and the communities of Sunland and Tujunga of air pollution, traffic and other dangers and annoyances as a result thereof"; and that "a rock and gravel operation upon the subject property could adversely affect

[1]The planning commission approved with certain recommended conditions plaintiffs' application for designation of their property as a "Rock and Gravel District"; the city council ultimately denied such application.

the reputation of the Sunland-Tujunga area as a haven for sufferers from respiratory ailments.''

There was substantial evidence that even though operated with all possible safeguards, the extraction of sand and gravel from the subject property would still create appreciable quantities of dust, which would be carried by the prevailing winds to the residences and sanitariums of Sunland and Tujunga; that this dust would have a damaging effect upon the sufferers from respiratory ailments; and also that such operations would adversely affect property values in those communities. The trial court concluded that plaintiffs' property was ''not arbitrarily, capriciously or unreasonably zoned'' under the ordinances prohibiting rock and gravel operations thereon; and that such zoning was ''not discriminatory'' nor did it offend constitutional guarantees protecting plaintiffs' property rights. (U.S. Const., 5th and 14th Amends.; Cal. Const., art. I, §§ 1, 13 and 14.) Accordingly, judgment was entered for defendant.

Plaintiffs argue that the zoning restriction in its application to their property is unconstitutional and void as being: (a) a denial of due process; (b) a denial of equal protection of the laws; (c) a taking of private property for public use without compensation; and (d) discriminatory in operation. They claim that the record clearly shows that their property is so-called ''one use property,'' having economic value only for the excavation of rock, sand and gravel; and that under the guise of enforcing police regulations, defendant is guilty of ''an unwarranted and arbitrary interference with'' their constitutional right ''to carry on a lawful business'' so as to render their property valueless.

The trial judge in his findings and conclusions of law which he drew therefrom showed a clear recognition of the respective functions of the legislative body in enacting a comprehensive zoning ordinance and of the courts in passing upon the constitutionality of such legislation. The origin and rapid growth and acceptance of the principle of comprehensive zoning as a constitutionally valid method of the regulation of the uses to which an owner might put his real property was a phenomenon of the late teens and early twenties of the present century. The first comprehensive zoning ordinance in the United States was enacted in 1916 in the City of New York (*Miller* v. *Board of Public Works,* 195 Cal. 477, 485 [234 P. 381, 38 A.L.R. 1479]), and in the space of nine years when

this court first sustained the constitutionality of the principle in the *Miller* case in 1925, a bulletin of the United States Department of Commerce showed that "35 states and the District of Columbia have adopted this form of regulation; 221 municipalities have been zoned and over 22,000,000 inhabitants, aggregating 40 per cent of the urban population of this country, are living in zoned territory." (*Miller* v. *Board of Public Works, supra*, p. 486.) This court further commented in *Miller* at page 486: "The rapidity of the growth of the sentiment in favor of comprehensive zoning, coupled with the extensive and successful application of the idea, are evidence of its present and potential value for the promotion and perpetuation, along broader and better lines, of the moral and material welfare of a people." When the Supreme Court of the United States in 1926 set its seal of approval upon the constitutionality of this then new type of legislation in *Euclid* v. *Ambler Realty Co.*, 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016], the cycle was completed, and comprehensive zoning in the short space of ten years had taken its place as a constitutionally recognized part of our legal and political system. We indulge in this bit of legal history because, as will appear, plaintiffs place their principal reliance upon language first found in cases decided long before the principle of comprehensive zoning was anywhere applied in this country or its constitutionality established.

Those early zoning cases laid down the broad pattern of the rules by which the constitutionality of such legislation is to be tested in the courts. Thus in *Euclid* v. *Ambler Realty Co., supra*, 272 U.S. at page 387, Mr. Justice Sutherland speaking for that court, said: "Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly

coming within the field of their operation. In a changing world, it is impossible that it should be otherwise.''

■ This principle of the elasticity of the application to be given to settled constitutional principles finds its echo in the language of this court in *Miller* v. *Board of Public Works, supra,* 195 Cal. at page 485: ''Thus it is apparent that the police power is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life and thereby keep pace with the social, economic, moral, and intellectual evolution of the human race. In brief, 'there is nothing known to the law that keeps more in step with human progress than does the exercise of this power.' ''

■ As a corollary to this recognized principle of the capacity of the police power to meet the reasonable current requirements of time and place and period in history is the equally well settled rule that the determination of the necessity and form of such regulations, as is true with all exercises of the police power, is primarily a legislative and not a judicial function, and is to be tested in the courts not by what the judges individually or collectively may think of the wisdom or necessity of a particular regulation, but solely by the answer to the question is there any reasonable basis in fact to support the legislative determination of the regulation's wisdom and necessity? ■ Thus in *Miller, supra,* this court said in 195 Cal. at page 490: ''The courts may differ with the legislature as to the wisdom and propriety of a particular enactment as a means of accomplishing a particular end, but as long as there are considerations of public health, safety, morals, or general welfare which the legislative body may have had in mind, which have justified the regulation, it must be assumed by the court that the legislative body had those considerations in mind and that those considerations did justify the regulation. . . . [W]hen the necessity or propriety of an enactment [is] a question upon which reasonable minds might differ, the propriety and necessity of such enactment [is] a matter of legislative determination.''

■ So in *Ambler, supra,* the United States Supreme Court said (272 U.S. at p. 388): ''If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control.'' This test of the validity of comprehensive zoning regulations

has consistently been applied and followed by this court, so that whenever we have found that reasonable minds might differ as to the necessity or propriety of particular regulations or classifications, we have bowed to the legislative determination and sustained the regulation. (See e.g., *Lockard* v. *City of Los Angeles,* 33 Cal.2d 453, 461 [202 P.2d 38, 7 A.L.R.2d 990]; *Wilkins* v. *City of San Bernardino,* 29 Cal. 2d 332, 339 [175 P.2d 542]; *Acker* v. *Baldwin,* 18 Cal.2d 341, 344 [115 P.2d 435]; *Sunny Slope Water Co.* v. *City of Pasadena,* 1 Cal.2d 87, 93-94 [33 P.2d 672].)

It was in clear recognition of this principle of the division of functions between the legislative and judicial branches that the trial judge in effect concluded that although his own determination, if the questions presented had been his to decide, would have been to the contrary, since under the evidence presented to the legislative body and to the court reasonable minds could differ, he must bow to the legislative conclusion. Plaintiffs do not question the correctness of this rule as a general guide to be followed in determining the constitutionality of zoning ordinances, but they make the narrower contention that where property is primarily or preponderantly valuable for the extraction therefrom of a natural resource, here the valuable sand and gravel deposits in their land, the legislative authorities may not constitutionally prohibit it altogether, although they admit that they may otherwise regulate the extraction and recovery of such natural resources. In support of this position plaintiffs primarily rely upon five California cases and one case from the Supreme Court of the United States: *In re Kelso* (1905), 147 Cal. 609 [82 P. 241, 109 Am.St.Rep. 178, 2 L.R.A. N.S. 796]; *In re Throop* (1915), 169 Cal. 93 [145 P. 1029]; *People* v. *Hawley* (1929), 207 Cal. 395 [279 P. 136]; *Wheeler* v. *Gregg* (1949), 90 Cal.App.2d 348 [203 P.2d 37]; *Morton* v. *Superior Court* (1954), 124 Cal.App.2d 577 [269 P.2d 81, 47 A.L.R.2d 478]; *Pennsylvania Coal Co.* v. *Mahon* (1922), 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322, 28 A.L.R. 1321].

We must admit that there is language in these cases, which pressed to its ultimate conclusion, and divorced from the facts of each particular case in which it was used, lends color to plaintiffs' position. Typical is the statement in the earliest of them, *Kelso,* 147 Cal. at page 612: "It [the ordinance under attack] is in no sense a mere regulation as to the manner in which rock or stone may be removed from the

land by the owner thereof, but is an absolute prohibition of any such removal. However valuable the rock or stone may be if removed, and however valueless if not removed, the owner must allow it to remain in its place of deposit. Such a prohibition might be justified, if the removal could not be effected without improperly invading the rights of others, but it cannot be doubted that rock and stone may under some circumstances be so severed from the land and removed as not in the slightest degree to inflict any injury which the law will recognize. So far as such use of one's property may be had without injury to others it is lawful use which cannot be absolutely prohibited by the legislative department under the guise of the exercise of the police power.''

Of this case and *Throop, supra,* 169 Cal. 93, it is to be noted that both were decided long before the principle of comprehensive zoning had been enacted into legislation anywhere in the United States; and hence long before the precise constitutional theories upon which such legislation was later sustained had been anywhere formulated. ▆▆ The primary purpose of comprehensive zoning is to protect others, and the general public, from uses of property which will, if permitted, prove injurious to them. Thus in saying in *Kelso:* ''So far as such use of one's property may be had *without injury to others* it is a lawful use which cannot be absolutely prohibited,'' (emphasis added) this court, somewhat prophetically, left open the very question with which we are here concerned, because the legislative body in our case has determined that the prohibited use cannot be had without injury to others and the trial court has found that that is a question upon which reasonable minds may differ, and for that reason is concluded by the legislative determination.

*People* v. *Hawley, supra,* 207 Cal. 395, concerned three separate actions brought with respect to certain excavations being made by the Los Angeles Rock and Gravel Company. One action involved a nuisance per se (Code Civ. Proc., § 731) and the other two actions involved the validity of two Los Angeles zoning ordinances. All three actions were tried together for determination of the facts. In the nuisance action the trial court made findings including injunctions affirmative and injunctions negative which thereby allowed the rock and gravel company to proceed but in a proper and legal manner. As to the zoning actions, the trial court found that

"to permit the company to continue its excavation operations upon [its own] lands subject to the conditions imposed upon said operations by the judgment and decree in [the nuisance case] would not result in any substantial injury to adjoining property or to persons residing or owning property in the near vicinity of the lands of [the] company" and "[a]ny [city] ordinance which would enjoin and prohibit the company from thus using its property [was] . . . void." (P. 413.) In so concluding this court upon citation of *In re Kelso, supra,* 147 Cal. 609, stated at page 412: "No authority is required to support the proposition that the business of excavating rock and gravel by the owner from lands belonging to him is a lawful and useful occupation, and cannot be prohibited by legislation except in cases where the enactment of such legislation may be found necessary for the protection of the *legal rights* of others." (Emphasis added.) In this case this court *affirmed* the judgment of the trial court and, in stressing the factual basis of the decision, this court on review referred to the large amount of evidence heard by the trial court (p. 403) and such significant findings as these: That the work which the company was doing when done properly pursuant to the conditions imposed by the judgment in the nuisance action would be a positive benefit to the adjoining property by controlling flood waters and carrying them off; that the alleged objectionable noise from the company's operations would be less than the noise made by the equipment used on certain railroads which ran along the entire length of the company's property; and that the company proposed to conduct its business and excavations "in such a way as to create no menace to public health, safety or morals." (P. 410.) This court in deciding *Hawley* cited *Miller* v. *Board of Public Works, supra,* 195 Cal. 477 (see 207 Cal. at p. 410) and other cases which recognized the rule that if reasonable minds may differ on the necessity of a zoning classification, the courts will not interfere. We can only conclude that in *Hawley* this court must have determined that on no reasonable hypothesis could the legislative determination be supported under the facts established in that case.

*Wheeler* v. *Gregg, supra,* 90 Cal.App.2d 348, was an action by a group of neighboring property owners to nullify the city's *grant of a conditional use permit to defendant* for operation of a stone quarry on his property in a residential district. The city had imposed certain conditions on the quarry

operations and the trial court imposed further operational restrictions. On appeal it was held that the quarry operations as limited by the terms of the permit and the order of the trial court would not be a nuisance. In so concluding the court said at pages 364-365: "[T]he reasonableness of the zoning as applied to certain lines of commercial zoning must be distinguished from the reasonableness of zoning regulations prohibiting the development of natural resources. The exclusion of ordinary business enterprises does not destroy any inherent property right, and, if not discriminatory, will be held reasonable and valid. Most such businesses can be conducted at any other designated place. But rock and gravel, like any other natural resource, can be obtained only in those particular areas where the deposit has been lodged by nature. Therefore, it follows that to absolutely prohibit the removal of rock, sand and gravel from one's own land in an instance where such land is primarily valuable only by reason of the existence of rock, sand and gravel, *might be regarded* as an unreasonable exercise of the police power." (Emphasis added.) Since the court was affirming a permit *legalizing* the questioned use of the property the last-quoted language was obviously dictum.

*Morton* v. *Superior Court, supra,* 124 Cal.App.2d 577, was an action by the county and state to enjoin the operation of a rock quarry on the ground that it constituted a nuisance and that it was being operated in violation of regulatory ordinances. Although the nearest property owners apparently did not object, others complained that operation of the quarry should be enjoined as a nuisance because of the dust it created, the noise of the rock-crushing machinery, particularly during hours when such noises were most objectionable, such as evenings and Sunday mornings, and the traffic problems or hazards that resulted on a nearby public highway in consequence of the movement of trucks to and from the quarry. An injunction by the trial court prohibiting the operation of the quarry at all was held too broad, since where the business itself was lawful and not a nuisance per se, it could not be enjoined *in toto*, if its operations could be reformed so as to eliminate the objectionable aspects. Otherwise, in cases where land might have no other value or purpose than for quarrying, the owner in effect would be deprived of his property without due process of law. The *Morton* case cites and relies heavily on *Wheeler* v. *Gregg, supra, People* v. *Hawley, supra,*

*In re Kelso, supra,* and *In re Throop, supra* (124 Cal.App.2d at pp. 584-586) for the proposition that since a quarry is basically a lawful business and not a nuisance per se, but only subject to becoming so under particular circumstances, a municipality cannot outlaw such business altogether. This case, like *Throop* and *Hawley,* did not deal with a comprehensive zoning ordinance, although it did involve a use permit ordinance apparently effective in every part of the county, and the applicability and effect of which was, as noted by the court, at that very time being litigated in another action. (124 Cal.App.2d at pp. 587-588.)

The *Kelso, Throop* and *Hawley* cases were distinguished in *In re Angelus* (1944) 65 Cal.App.2d 441 [150 P.2d 908], wherein the petitioner was seeking a writ of habeas corpus to invalidate the local zoning ordinance which prohibited rock, sand and gravel excavating operations on his property. In upholding the validity of the ordinance as a proper exercise of the police power, the court said at pages 448-449: "The petitioner cites and relies on *In re Kelso* . . . and *In re Throop.* . . . We think neither case is pertinent because neither case involved a zoning ordinance. He also cites and relies on *People* v. *Hawley.* . . . That case is more nearly in point but it is to be distinguished in its facts." And at page 453: "As we stated in the beginning . . . *In re Kelso, supra,* did not involve a zoning ordinance, however *Miller* v. *Board of Public Works,* 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479], did. Therefore in the very beginning of that case, on page 483, the court quoted the provisions of the enabling act of 1917 which authorized the enactment of zoning ordinances." The court then quoted at length from the *Miller* case to the effect that the police power is a developing factor so as to meet changing conditions in promoting the "health, safety, morals, or general welfare of the public" and in its exercise a "large discretion is vested in the legislative branch of the government," for it is "only when it is palpable that the measure in controversy has no real or substantial relation to the public health, safety, morals, or general welfare that it will be nullified by the courts." (P. 454.) The court concluded this phase of its discussion at page 455: "Those passages [from the *Miller* case] make it clear that what was not proper practice at the time the court decided *In re Kelso, supra,* was by virtue of the enactment of the statute of 1917 a proper enactment within the purview of the police power."

The *Kelso* case was also noted and distinguished in *West Bros. Brick Co.* v. *City of Alexandria* (1937) 169 Va. 271 [192 S.E. 881] (a leading case with reference to the validity of a local ordinance forbidding excavations of brick clay in a residential area) as follows at page 889 [192 S.E.]: "Many cases are cited as showing, or tending to show, the unreasonableness of the ordinance in judgment. Among them are these:

"*Re Kelso,* 147 Cal. 609 [82 P. 241, 109 Am.St.Rep. 178, 2 L.R.A. N.S. 796]. . . . That was decided more than thirty years ago. A San Francisco ordinance prohibited the operation of a quarry in a given district. The court said that there were many ways of operating a quarry, some of which could harm no one. It recognized the fact that one operated by blasts might be prohibited and that its operations might be hedged about by valid regulations which would make it unprofitable. If that case intended to hold that the city cannot forbid the operation of quarries, operated as quarries are ordinarily operated, *where people live or are accustomed to move, then it is out of touch with latter day extensions of police power.*" (Emphasis added.)

The *Pennsylvania Coal Co.* case, *supra,* 260 U.S. 393, held unconstitutional a statute prohibiting the mining of coal under private dwellings and streets or cities, where the right to conduct such mining operations had been reserved in transferring the surface. It was decided before the principles of comprehensive zoning were established and differs from our case additionally in that the mining was to be done underground and the persons to be benefited by the legislation were grantees as to whom the right to mine had been expressly reserved. Judge Wilbur said in an opinion sustaining a Los Angeles comprehensive zoning ordinance prohibiting the extraction of oil from lands in a residential zone (*Marblehead Land Co.* v. *City of Los Angeles,* 47 F.2d 528, 532), referring to the *Pennsylvania Coal Company* case: "The state Legislature prohibited mining in such fashion as would interfere with the structures erected by the grantees upon the surface, thus in effect giving to the grantees a security in the enjoyment of the surface which they had not bargained nor paid for, and depriving a grantor of the right it had reserved in its deed to the grantee. It was held that this was so unreasonable . . . that it was violative of the constitutional rights guaranteed to the Pennsylvania Coal Company. . . . While this decision deals with the right of an owner to develop its inher-

ent potentialities by producing therefrom its mineral wealth, there does not seem to be any distinction in principle between depriving an owner of the right to develop such inherent qualities of the land and a regulation which prohibits an owner from erecting upon his land structures which he believes will, and which in fact will, enhance the value of his property.'' (See also *West Bros. Brick Co.* v. *City of Alexandria, supra,* 192 S.E. 881, 889, and *Town of Burlington* v. *Dunn,* 318 Mass. 216 [61 N.E.2d 243, 246, 168 A.L.R. 1181], where the courts also distinguish *Pennsylvania Coal Co.* and hold it inapplicable to comprehensive zoning.)

Too many cases have been decided upholding the constitutionality of comprehensive zoning ordinances prohibiting the removal of natural products from lands in certain zones for us now to accept at full value the suggestion that there is such an inherent difference in natural products of the property that in a case where reasonable minds may differ as to the necessity of such prohibition the same power to prohibit the extraction of natural products does not inhere in the legislative body as it has to prohibit uses of other sorts. (*Friel* v. *County of Los Angeles,* 172 Cal.App.2d 142 [342 P.2d 374] [oil and gas]; *In re Angelus, supra,* 65 Cal.App.2d 441 [sand and gravel]; *Marblehead Land Co.* v. *City of Los Angeles, supra,* 47 F.2d 528, cert. den. 284 U.S. 634 [52 S.Ct. 18, 76 L.Ed. 540] [oil and gas]; *West Bros. Brick Co.* v. *City of Alexandria, supra,* 169 Va. 271, app. dism. 302 U.S. 658 [85 S.Ct. 369, 82 L.Ed. 508] [brick clay]; *County Commissioners of Howard County* v. *Merryman,* 222 Md. 314 [159 A.2d 854] [sand and gravel]; *Township of Bloomfield* v. *Beardslee,* 349 Mich. 296 [84 N.W.2d 537] [gravel]; *Moore* v. *Memphis Stone & Gravel Co.,* 47 Tenn.App. 461 [339 S.W.2d 29] [gravel]; *Raimondo* v. *Board of Appeals of Bedford,* 331 Mass. 228 [118 N.E.2d 67] [sand and gravel]; *Town of Seekonk* v. *John J. McHale & Sons,* 325 Mass. 271 [90 N.E.2d 325] [gravel]; *Fred* v. *Mayor & Council of Borough of Old Tappan,* 10 N.J. 515 [92 A.2d 473] [topsoil]; *Town of Burlington* v. *Dunn, supra,* 61 N.E.2d 243, cert. den. 326 U.S. 739 [66 S.Ct. 51, 90 L.Ed. 441] [topsoil]; *Miesz* v. *Village of Mayfield Heights,* 92 Ohio App. 471 [111 N.E.2d 20] [topsoil]; *People* v. *Gerus,* 19 Misc.2d 389 [69 N.Y.S.2d 283] [sand and gravel]; *Krantz* v. *Town of Amherst,* 192 Misc. 912 [80 N.Y.S.2d 812] [topsoil]; *K. & L. Oil Co.* v. *Oklahoma City,* 14 F.Supp. 492 [oil]; and see *Beverly Oil Co.* v. *City of*

*Los Angeles,* 40 Cal.2d 552 [254 P.2d 865]; *Pacific Palisades Assn.* v. *City of Huntington Beach,* 196 Cal. 211 [237 P. 538, 40 A.L.R. 782].)

Plaintiffs rely heavily upon the finding of the trial court ''that the subject property has no appreciable economic value for any of the uses permitted in the A1, A2 and RA zones, or for any other use except for the purpose of excavating, crushing and processing rock, sand and gravel and activities related or incidental thereto, and if such use is prohibited, it will destroy the economic value thereof.'' There was testimony before the legislative body that the property could be successfully devoted to certain other uses, i.e., for stabling horses, cattle feeding and grazing, chicken raising, dog kennels, fish hatcheries, golf courses, certain types of horticulture, and recreation. It must be conceded that in relation to its value for the extraction of rock, sand and gravel the value of the property for any of the described uses is relatively small if not minimal, and that as to a considerable part of it seasonal flooding might prevent its continuous use for any purpose. ''However, the very essence of the police power as differentiated from the power of eminent domain is that the deprivation of individual rights and property cannot prevent its operation, once it is shown that its exercise is proper and that the method of its exercise is reasonably within the meaning of due process of law. . . . And it is recognized that oil production is a business which must operate, if at all, where the resources are found. Nevertheless city zoning ordinances prohibiting the production of oil in designated areas have been held valid.'' (*Beverly Oil Co.* v. *City of Los Angeles, supra,* 40 Cal.2d 552, 557-558.)

In *Beverly* at page 557 this court quoted from *Hadacheck* v. *Sebastian,* 239 U.S. 394, 410 [36 S.Ct. 143, 60 L.Ed. 348]: ''It is to be remembered that we are dealing with one of the most essential powers of the government, one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily. A vested interest cannot be asserted against it because of conditions once obtaining. [Citation.] To so hold would preclude development and fix a city forever in its primitive conditions. There must be progress, and if in its march private interests are in the way they must yield to the good of the community.''

More than one court has pointed out, as was done by Judge Wilbur, in the passage quoted above from the *Marblehead Land Co.* case, 47 F.2d at page 532, that "there does not seem to be any distinction in principle between depriving an owner of the right to develop such inherent qualities of the land and a regulation which prohibits an owner from erecting on his land structures which he believes will, and which in fact will, enhance the value of the property."

In *Town of Seekonk* v. *John J. McHale & Sons, supra,* 90 N.E.2d at page 327, the Supreme Judicial Court of Massachusetts put it this way: "The appealing defendant further contends that the zoning by-law is unconstitutional if it prevents the owner from removing a natural product from his land. But all zoning restricts an owner in the uses he could otherwise make of his property. There seems to us to be no difference in principle whether the restriction takes the form of preventing the owner from building a factory or from establishing a gravel business."

The Supreme Court of Michigan in *Township of Bloomfield* v. *Beardslee, supra,* 84 N.W.2d at page 540, said: "It is urged to us that the ordinance prohibits the removal of a natural resource. This, the owner insists is invalid. 'There exists,' we are told, 'a legal right to exploit natural resources where they may be found' . . . that the 'extraction of natural resources . . . must be undertaken at that spot or not at all.'

"Attractive though the argument may seem upon its first reading, it must be obvious that a logical application of its principle would be destructive of all zoning. For in each case the particular parcel has, it is always asserted, some peculiar utility: it is an ideal spot for a motel, or a factory, or a junk yard, or what not. It has that contiguity to traffic, that peculiar topographical structure, that supply of water or shade, which makes it unique. Yet, just as the surface user desired by the owner must give way, at times, to the public good, so must the sub-surface exploitation."

Finally on this point we quote from the *West Bros. Brick Co.* case, *supra,* 192 S.E. at page 890: "The enactment of zoning ordinances and cases which test them are all within the recollection of most of us. General rules applicable thereto are now well settled. They must not be wholly unreasonable, but they are presumed to be valid and to have been promulgated by those familiar with local conditions. Vested interests will not defeat them, and of course constitutional rights are

not to be measured in terms of money. That, however, is a consideration to be remembered. Great financial losses should not be inflicted where benefits to others are negligible, but public welfare and public convenience do control and are in themselves terms constantly adjusted to meet new conditions. Upon those who would set aside such ordinances rests a heavy burden of proof. They stand when their validity is debatable.''

 It is our conclusion that, having found on substantial evidence that the necessity and propriety of the legislative action in this case is one upon which reasonable minds may differ, the trial court properly found in favor of the ordinance's constitutionality.

 Plaintiffs also contend that the challenged zoning law discriminates against their property in that Livingston Rock and Gravel Company conducts operations on some 125 acres contiguous to plaintiffs' property. The Livingston property adjoins plaintiffs' property west of Foothill Boulevard. About half of plaintiffs' property lies east of Foothill Boulevard and it has developed differently from the property west of the boulevard. The original permit for the Livingston rock and gravel operations was issued in 1931; the property having been worked some thirty years, is substantially depleted and its number of remaining years of economic operation is doubtful. The Livingston property, 125 acres, is considerably smaller than plaintiffs' property, 348 acres; it is not in the center of Tujunga Wash but in a side pocket formed by the hills; and according to expert evidence, its dust was less subject to being stirred and carried by the winds in the Tujunga Wash. As heretofore stated, the trial judge pursuant to stipulation of counsel made an extensive tour of inspection of plaintiffs' property and the surrounding area, which observations became evidence in the case in support of the findings. (*Wheeler* v. *Gregg, supra,* 90 Cal.App.2d 348, 366-367; see also *Friel* v. *County of Los Angeles, supra,* 172 Cal.App.2d 142, 148.) Appropriate here for consideration is the extensive memorandum opinion filed by the trial judge and included in the record (Rules on Appeal, rule 5(a), 50 Cal.2d 1, 5; see also *Clemons* v. *City of Los Angeles,* 36 Cal.2d 95, 100 [222 P.2d 439]), wherein the comment is made that upon ''viewing the Livingston parcel and the subject property, each in its entirety, reasonable minds can differ on the question of whether authority granted to operate one

for the extraction of rock, sand and gravel and to deny the same operation to the other is arbitrary and discriminatory.'' In concluding that it could not ''find a discriminatory application'' of the zoning law to plaintiffs' property, the trial court noted that there were ''substantial differences in the terrain and degree of development of the land south of and adjacent to the subject property east of Foothill Boulevard than west thereof. Viewing as we must 'the character of the property of the objecting parties, the nature of the surrounding terrain, the use to which each has been put, recent trends of development (*Lockard* v. *City of Los Angeles,* 33 Cal.2d 453, 462 [202 P.2d 38, 7 A.L.R.2d 990]), we cannot fail to observe but that the differences between the plaintiffs' entire parcel and the Livingston property are 'fairly debatable' (*Lockard* v. *City of Los Angeles, supra,* p. 462) and when comparability is debatable we may not substitute our judgment for that of the legislative body.'' As was stated in *Miller* v. *Board of Public Works, supra,* 195 Cal. 477, at page 495: ''Somewhere the line of demarcation must be drawn, and it is primarily the province of the municipal body to which the zoning function is committed to draw that line of demarcation, and it is neither the province nor the duty of courts to interfere with the discretion with which such bodies are invested in the absence of a clear showing of an abuse of that discretion.''

 We are satisfied that the zoning law is consistent with the obvious legislative policy in municipal planning and development of this area in furtherance of the best interests and general welfare of the community as a whole: To confine rock and gravel operations in the Tujunga Wash to the area *downstream* from the Hansen Dam, and to encourage and protect the welfare and growth of the residential communities of Sunland and Tujunga by preventing the extension of rock and gravel operations upstream from the dam, meanwhile letting the already existing but substantially depleted Livingston operation gradually work itself into oblivion. (See *Paramount Rock Co.* v. *County of San Diego,* 180 Cal.App.2d 217, 228-230 [4 Cal.Rptr. 317].)

 As an alternative ground for relief, plaintiffs sought a declaration of their right to conduct rock, sand and gravel operations on their property as a conditional use because of certain provisions of successive zoning ordinances. While

superficially it might appear that plaintiffs' theories of relief are mutually exclusive and inconsistent—on the one hand applying for a variance from the zoning law which necessarily concedes the existence of a restriction of use and on the other hand, seeking a declaration that no restriction exists so that the desired use is not subject to injunction—plaintiffs' concessions on their variance application cannot legally effect a waiver of any existing status rights of their property by reason of alleged exceptions or conditional use permits under successive zoning ordinances. (See *Rubin* v. *Board of Directors,* 16 Cal.2d 119, 126 [104 P.2d 1041].) The trial court found that plaintiffs' property did ''not have a conditional use, non-conforming use, or other status permitting it, under the ordinances of the City of Los Angeles, to excavate from and process upon the subject property, rock, sand and gravel.''

From the record it appears that until about 1935 plaintiffs' property was in a residential district but rock, sand and gravel operations were being conducted thereon as a nonconforming use. In 1935 these operations were voluntarily terminated and the site where the operations were located was taken in 1939 as part of the Hansen Dam condemnation proceedings. Concededly, there have been no active rock and gravel operations on plaintiffs' property since 1939.

In 1934 Ordinance No. 74140 was enacted whereby plaintiffs' property was established as within a residential district subject only to a variance in use ''for the particular purpose for which the original exception was granted as shown by the records.'' (§ 4(d).) There was no evidence that any ''original exception'' was ever specifically granted to permit rock, sand and gravel operations on plaintiffs' property, so the exception provision of the ordinance was inoperative to exclude plaintiffs' property from the residential restriction use. However, the same ordinance provided for continuance of nonconforming use but expressly declared that such use should be deemed discontinued and abandoned ''when such use has ceased to operate or the lot or premises has ceased to be used for such non-conforming purpose for a period of sixty (60) days.'' Therefore, conceding the existence of a nonconforming use status at the time of the 1934 ordinance, the complete cessation of such use on the subject property in 1935 or, even if that be the fact, in 1939 terminated any nonconforming use status; and since then to the present date plaintiffs have not attempted to conduct the desired operations

on their property. Ordinance No. 77000 adopted in 1936 and establishing the Los Angeles Municipal Code contained substantially the same provisions as Ordinance No. 74140 as here pertinent. (§§ 16.01-16.05.)

Plaintiffs further cite these additional ordinances: (1) Ordinance No. 90500, adopted in 1946, setting forth the "Comprehensive Zoning Plan of the City of Los Angeles" and providing that certain uses, including the development of natural resources other than drilling for oil, "existing at the time this Section becomes effective" shall be deemed to have been approved for conditional use (§ 12.24 B9); and (2) Ordinance No. 92679, enacted in 1948 and setting up rock and gravel districts, with permission thereby provided for continuance of any conditional use permit or any other right *already existing* for the development of rock and gravel (§ 13.03 D2). However, since the use of plaintiffs' property for rock, sand and gravel operations had already terminated some ten years previously, the 1946 and 1948 ordinances can add no force to plaintiffs' arguments here. The adoption of a comprehensive plan of community development looking toward the containment and eventual elimination of nonconforming uses, including rock and gravel operations, accords with recognized zoning objectives under settled legal principles. (*Paramount Rock Co.* v. *County of San Diego, supra,* 180 Cal. App.2d 217, 228-230.)

The judgment is affirmed.

Gibson, C. J., Traynor, J., Peters, J., and White, J., concurred.

McCOMB, J.—I dissent. I would reverse the judgment for the reasons expressed by Mr. Presiding Justice Fox in the opinion prepared by him for the District Court of Appeal in *Consolidated Rock Products Co.* v. *City of Los Angeles,* (Cal.App.) 15 Cal.Rptr. 775.

Schauer, J., concurred.

Appellants' petition for a rehearing was denied May 9, 1962. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.